Filed 5/5/25  P. v. Dorenzo CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | C100142 |
| Plaintiff and Respondent, | (Super. Ct. No. 20CF02631) |
| v. | |
| MATTHEW PERRY DORENZO, | |
| Defendant and Appellant. | |

On the evening of May 22, 2020, two separate groups were camped by a creek in Butte County.  The victim was with one group.  Defendant Matthew Perry Dorenzo was with the other.  Defendant's group played loud music into the night.  When the victim approached defendant's group and asked defendant's group to "please shut the fuck up," defendant cleaved defendant's chest with an axe, injuring but not killing him.  According to the victim, both before and after striking him with the axe, defendant said, "I've killed and I'll do it again . . . I'll kill you and I've done it before."

1

Defendant was charged with, among other things, criminal threats. It was further alleged that, in committing that offense, he personally inflicted great bodily injury and he personally used a deadly weapon. During deliberations, the jury submitted a note to the trial court asking: "For the special allegations for . . . criminal threats–do the threats have to have been made prior to the great bodily injury and/or using a deadly or dangerous weapon? Or does the timeline not matter?" With both parties' agreement, the court responded that the "timeline does not matter." The jury found defendant guilty of criminal threats and found the enhancement allegations true. The trial court sentenced defendant to 15 years in prison.

Defendant argues that (1) the trial court erred in its response to the jury's question, and (2) he was deprived of the effective assistance of counsel based on his attorney's failure to object to the trial court's proposed response and to suggest a different response. We conclude defendant forfeited his first contention and, even if his attorney should have objected and proposed a different response, defendant has not demonstrated prejudice.

BACKGROUND

*Amended Information*

An amended information charged defendant with assault with a deadly weapon (Pen. Code,[1] § 245, subd. (a)(1); count 1), criminal threats (§ 422, subd. (a); count 2), and attempted murder (§§ 664, 187, subd. (a); count 3). On counts 1 and 2, the information alleged defendant personally inflicted great bodily injury. (§ 12022.7, subd. (a).) On counts 2 and 3, the information alleged defendant personally used a deadly or dangerous weapon. (§ 12022, subd. (b)(1).) The information also alleged defendant had sustained a prior serious felony conviction (§ 667, subd. (a)(1)), and that he was subject to the "Three

---

[1]     Further undesignated statutory references are to the Penal Code.

2

Strikes" sentencing law (§§ 667, subds. (b)-(j), 1170.12).  The information also alleged six circumstances in aggravation.  (Cal. Rules of Court, rule 4.421.)

*The Prosecution*

On May 22, 2020, the victim was camping in Butte County with his wife Lauren,[2] their children, his mother Linda, and Linda's boyfriend Kevin.  Another group, numbering six or seven people according to the victim and even more according to Lauren, set up camp nearby.  They were playing very loud music.

Around 9:30 p.m., Lauren and the children got ready for bed, but the other group was still playing loud music, yelling, and carrying on.  At about 10:00 or 10:30 p.m., people from the other group started throwing rocks and beer bottles.  At some point, a beer bottle hit Lauren's tent.

The victim walked toward the other campsite and said, "Can you please shut the fuck up?  My wife is trying to sleep right here."  Defendant emerged from the shadows and said, "[W]hat did you say?" and, "I've killed and I'll do it again . . . I'll kill you and I've done it before."  Defendant said he would kill the victim and his family.  Defendant then struck the victim in the chest with an axe.  According to the victim, defendant made his threats both before and after striking him with the axe.  Both before and after, defendant said he had "done it once before, and he'll do it again" and that he was going to kill the victim.

The victim took the axe out of his chest and dropped it to the ground.  Inside her tent, Lauren heard the victim say he had been hit with a shovel.  Later, she would learn he had actually been hit with an axe.

---

[2]      To protect their privacy, we will refer to the witnesses and other individuals by their first names or initials.  (Cal. Rules of Court, rule 8.90(b)(10) & (11).)  No disrespect is intended.

Defendant and the victim tussled and tumbled downhill to the creek. "[I]t was like a tumble fight. Like I fell onto the ground. I rolled." The victim also testified that defendant and his associates dragged him toward the creek. In the creek, defendant started beating the victim and shoved his face in the water; according to the victim, defendant was trying to drown him. The victim testified that a couple of people from defendant's group were trying to break up the fight while a couple of other people "were helping him." Lauren ran out of her tent and saw the victim in the water surrounded by three to five people. She did not hear any threats at that time.

Lauren and Kevin both ran towards the altercation. Defendant and the victim continued to fight. The victim managed to grab a rock and hit defendant in the head with it several times, knocking defendant unconscious. The victim testified he never choked defendant. After defendant regained consciousness, he "got back in [the victim's] face," and told the victim "that he killed before and he's going to do it again."

Linda fired shots from her .22-caliber rifle into the air to break up the altercation and everyone scattered. According to Lauren, after the victim returned to their campsite, defendant said to her that he would kill her and her family, that he had done it before, and he would do it again. Defendant returned to his campsite and told his children that if they did not find his keys, he would kill them too.

Lauren drove the victim to the hospital. Medical personnel had to close the victim's chest wound with hundreds of stitches and staples.

T.F. knew defendant through his previous work, and he was in the group of people camping with defendant. That evening they listened to music and drank, and, after a while, T.F. went to bed. At some point, T.F.'s girlfriend woke him up and said something was going on outside. T.F. went outside and broke up a fight. He remembered seeing a man bleeding a lot from his chest. That man was punching defendant, who was on the ground. As T.F. separated the men, defendant said, "I'm going to kill you" to the

4

bleeding man.  The next day, T.F. received a text message from defendant telling him, "[I]f the cops come, don't say nothing," or something similar.

The Butte County Sheriff's Department located an axe at the campsite and also found a knife by the creek.  The victim and Lauren both testified that the knife was not the victim's, and the victim did not recall seeing it on the day of the incident.  The sheriff's department also collected a .22-caliber rifle from one of the tents left at the campground.

Detective Zachary Price interviewed defendant on May 23, 2020, and defendant reported that he had been hit and choked.  Defendant had abrasions on his nose and forehead and a contusion below one of his eyes, but Detective Price did not see any injuries consistent with defendant being choked.

*The Defense*

*Defendant's Wife's Account*

Defendant's wife B.D. testified that she went camping with defendant and three of their children and several others including acquaintances Michael and M.R. who brought their baby.  After they set up camp, the adults had quite a few drinks.  There was music playing and the group "got a little rowdy" and loud, but it was "nothing major."

As the evening wore on, B.D. noticed two men staring down at them from a nearby campsite.  At some point, something hit the tent in which Michael and M.R.'s baby was sleeping.  B.D. then saw the two "pretty big" men approaching from across the creek.  The men were yelling, "[W]e told you to shut the fuck up."  B.D. turned to check on her children, and, when she turned back, she saw a man choking defendant by the creek.  She testified that 30 to 45 seconds elapsed between when she saw the men approaching them and when she saw the man choking defendant.  She also saw the man hit defendant in the head, and she saw defendant lose consciousness.  She did not see blood on either of the men from the other campsite, and did not see anyone bleeding from the chest.

5

B.D. went to "get the man off of my husband." She ran over and reached for the man, but another man grabbed her and threw her into the creek. Once in the creek, B.D. felt like she was being sat upon. She was face down, partly underwater, and could not breathe. After 10 or 15 seconds, she was able to stand up. Defendant meanwhile, regained consciousness. B.D. did not hear him say, "I'm going to kill you."

B.D. saw that defendant's face was very bloody and his nose was bleeding profusely. The other men started going back up the hill. Defendant and B.D. searched for their keys and, once they found them, they left. B.D. did not hear defendant threaten to kill his children, and testified that he would not do so. B.D. did not see anyone using any weapons that night and did not recall hearing any gunshots.

*Defendant's Account*

Defendant, who acknowledged a 2013 felony assault with a deadly weapon conviction, testified that, when they were sitting around the campfire that night, he heard a sound and realized someone threw something at them. It sounded like a bottle hitting rocks. Defendant grew angry and frightened for the safety of his children. According to defendant, Michael pulled out a pistol and loaded it. This made defendant feel like "we are under attack."

Defendant then saw two men approaching. A big man was "screaming at us to shut the fuck up." The man was threatening to hurt them. Defendant testified that the man "had his hand out, looked like he was pointing, but it also looked like he had a stick or something in his hand." The man, who defendant later learned was the victim, charged across the creek at defendant. Defendant "instinctively grabbed what was near" him, an axe, and told the victim to get back. The victim was running toward him, and defendant backed up, tripped, stumbled backwards, and "just took a swipe at him." According to defendant, there was not "much power behind" his swing, and he did not want to hurt or kill the victim. Defendant did not remember whether the axe came into contact with the victim. It did not feel to defendant like he hit anything.

6

The victim "back[ed] off" and then defendant saw Kevin "put his hands on my wife." Defendant punched Kevin in the face, Kevin "bear hugged" him, and they both fell to the ground. According to defendant, "in the chaos," the victim choked him to unconsciousness. Defendant did not recall what he might have said when he regained consciousness, or whether he said, "I'm going to kill you," but he testified that someone "waking up from being unconscious can say a lot of things." Defendant recalled hearing gunshots.

After the altercation broke up, defendant could not find his keys. Eventually, B.D. found them and they left. Defendant planned to go to the sheriff's office the following day to report the incident, but he got arrested before he could. Defendant acknowledged sending a text message to T.F. telling him not to tell law enforcement what happened. He explained that, in his opinion, in "that situation" police are not "your friends." They will "use it against you, they'll ruin your life for the simplest thing."

*The Prosecution's Rebuttal*

Michael testified he did not pull out or load a handgun during the altercation.

*Relevant Jury Instructions*

The trial court instructed the jury on the great bodily injury enhancement, in pertinent part, as follows: "If you find the defendant guilty of the crimes charged in Counts 1, 2, you must then decide whether, for each crime, the People have proved the additional allegation that the defendant personally inflicted great bodily injury on [the victim] *during the commission of that crime. . . .* [¶] . . . [¶] The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved." (CALCRIM No. 3160, italics added.)

The trial court instructed the jury on the personal use of a deadly weapon enhancement, in pertinent part, as follows: "If you find the defendant guilty of the crimes charged in Counts 2, 3, or of attempting to commit those crimes, you must then decide

7

whether, for each crime, the People have proved the additional allegation that the defendant personally used a deadly weapon *during the commission or attempted commission of that crime. . . .* [¶] . . . [¶] The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved." (CALCRIM No. 3145, italics added.)

*Jury Inquiry No. 3*

During deliberations, the jury submitted a note to the trial court, Jury Inquiry No. 3, reading: "For the special allegations for count 2 criminal threats–do the threats have to have been made prior to the great bodily injury and/or using a deadly or dangerous weapon? Or does the timeline not matter?"

The trial court informed the parties that it was "inclined to respond that the timeline does not matter." The prosecutor responded, "[t]hat would be the People's position . . . ." Defense counsel stated: "I looked into this yesterday in the morning. And I think that the answer is the timeline doesn't matter. And my reasoning is that if he's already injured when the threat is made, then . . . it would more easily place him in sustained fear. So I agree with the Court." The trial court responded to Jury Inquiry No. 3: "The timeline does not matter."

*Verdict and Sentencing*

The jury found defendant guilty of criminal threats on count 2 and found true the allegations that, in the commission of that offense, he personally used a deadly or dangerous weapon and personally inflicted great bodily injury. The jury was unable to reach a verdict on counts 1 and 3, and the trial court declared a mistrial on those counts. In a bifurcated proceeding, the trial court found true the allegation that defendant had sustained a prior serious felony conviction, and found true the aggravating circumstances.

The trial court denied defendant's *Romero* motion to strike his strike prior. (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.) The court sentenced defendant to an aggregate term of 15 years in prison consisting of the upper term of three

8

years on the criminal threats count, doubled to six years based on his prior strike conviction, three years for the great bodily injury enhancement, one year for the deadly or dangerous weapon enhancement, and five years for the prior serious felony enhancement.

DISCUSSION

I

*The Trial Court's Response to Jury Question*

Defendant argues that the trial court erred in responding to the jury's question. We agree with the People that defendant has forfeited his contention.

A defendant forfeits a challenge to the manner in which a trial court responds to a jury question by failing to request a different response or by agreeing with the response proposed by the court. (*People v. Davis* (2009) 46 Cal.4th 539, 616-617 [defendant forfeited claim of error by assenting to the trial court's response to a jury inquiry and failing to request the alternative responses he suggests on appeal]; *People v. Rogers* (2006) 39 Cal.4th 826, 877 [defense counsel's acquiescence in the trial court's response to a jury inquiry forfeits the claim of error on appeal]; see also *People v. Dykes* (2009) 46 Cal.4th 731, 802 ["When the trial court responds to a question from a deliberating jury with a generally correct and pertinent statement of the law, a party who believes the court's response should be modified or clarified must make a contemporaneous request to that effect; failure to object to the trial court's wording or to request clarification results in forfeiture of the claim on appeal"].)

Here, defendant agreed with the trial court's proposed response to the jury inquiry. He stated that he thought "that the answer is the timeline doesn't matter. And my reasoning is that if he's already injured when the threat is made, then . . . it would more easily place him in sustained fear. So I agree with the Court."

Additionally, in his briefing, defendant does not argue that the response affected his substantial rights. (See § 1259 [appellate court may review any instruction, even though no objection was made in the trial court, if the defendant's substantial rights were

9

affected]; see also *People v. Kopp* (2019) 38 Cal.App.5th 47, 66, fn. 12 [discussing the applicability of § 1259 to the court's response to a jury inquiry], review granted Nov. 13, 2019, S257844, fully briefed.)  Nor does defendant expressly argue that the trial court's response was not a generally correct statement of law, only that further elaboration was required.

By failing to object and to propose a different response, and instead agreeing with the trial court's proposed response, defendant forfeited his contention on appeal.

II

*Ineffective Assistance of Counsel*

Defendant argues that he was deprived of the effective assistance of counsel when his attorney acquiesced to the trial court's proposed response.  He argues that his attorney should have requested that the court instruct the jurors that the timeline did not matter, so long as all of the jurors agreed that the great bodily injury and use of a deadly weapon "related to the same criminal transaction as the criminal threats."  We conclude that, even if counsel's performance was deficient, defendant has not demonstrated prejudice.

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.)  "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.  In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . , that course should be followed." (*Strickland,* at p. 697.)

10

"[S]ection 1138 imposes on the trial court a mandatory 'duty to clear up any instructional confusion expressed by the jury.' " (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1016.) " 'When a jury asks a question after retiring for deliberation, ". . . [s]ection 1138 imposes upon the court a duty to provide the jury with information the jury desires on points of law." [Citation.] But "[t]his does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under . . . section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." ' " (*Ibid.*)

The analogous phrase " 'in the commission of' has been given an expansive, not a tailored meaning." (*People v. Frausto* (2009) 180 Cal.App.4th 890, 900 (*Frausto*).) A broad construction of this phrase furthers the purposes of both a weapons enhancement and a great bodily injury enhancement. (*People v. Elder* (2014) 227 Cal.App.4th 411, 422-423 (*Elder*).) An act or circumstance alleged in an enhancement allegation " 'may be deemed to occur "in the commission of" the offense if it occurred *before*, *during*, *or after* the technical completion of the felonious . . . act.' " (*Id*. at p. 422, quoting *People v. Jones* (2001) 25 Cal.4th 98, 110.) "Temporal niceties are not determinative," and the act contemplated by the enhancement taking place "before, during, or after the felonious act may be sufficient if it can fairly be said that is was a part of a continuous transaction." (*Frausto,* at p. 902.) Thus, "a firearm is discharged 'in the commission of' a felony within the meaning of section 12022.53[, subdivision] (d) if the underlying felony and the discharge of the firearm are part of one continuous transaction, including flight after the felony to a place of temporary safety." (*Ibid.*)

Again, defendant argues that his trial attorney should have objected to the language proposed by the trial court and proposed language instructing the jury that the timeline did not matter, so long as all of the jurors agreed that the great bodily injury and use of a deadly weapon "related to the same criminal transaction as the criminal threats." While perhaps correct under the case law, that language is not required by any authority.

11

And appellate courts have repeatedly cautioned against using language from appellate decisions in jury instructions. (See *People v. Colantuono* (1994) 7 Cal.4th 206, 221, fn. 13; *People v. Southard* (2021) 62 Cal.App.5th 424, 427, 435-436.)

In any event, even if defense counsel's performance fell below an objective standard of reasonableness—a finding we do not make here—defendant has not established resulting prejudice. To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland, supra*, 466 U.S. at pp. 693-694; *People v. Ledesma, supra*, 43 Cal.3d at pp. 217-218.)

The victim's testimony provided evidence that defendant made criminal threats *both before and after* the defendant struck him in the chest with an axe. Both Lauren and T.F. heard defendant make threats after he struck the victim with the axe. Defendant's wife B.D. did not hear defendant threaten anyone, and, for his part, defendant did not recall making threats but agreed someone might say a lot of things upon regaining consciousness.

The jury instructions made clear that the jury was required to find that the acts or circumstances alleged in the enhancements occurred "during the commission" of the crime of making criminal threats. We conclude that the instructions thus sufficiently tethered the acts or circumstances alleged in the enhancements to the substantive crime as a continuous transaction. And because an act or circumstance " 'may be deemed to occur "in the commission of" the offense if it occurred *before*, *during*, *or after* the technical completion of the felonious . . . act' " (*Elder, supra*, 227 Cal.App.4th at p. 422), the trial court's response correctly informed the jury, in response to the specific inquiry, that the "timeline does not matter."

Defendant has not adequately explained how his acts of personally striking the victim with a deadly weapon and personally inflicting great bodily injury were not "part of one continuous transaction" along with his criminal threats which, according to the

12

victim, were made *both before and after* the axe blow.  (*Frausto, supra*, 180 Cal.App.4th at p. 902.)  Defendant suggests that when the altercation spilled over into the creek it constituted a separate and distinct transaction, and therefore, if instructed as he proposes, at least one juror may have concluded that he made criminal threats only *after* he earlier struck the victim with an axe, and the threats were part of a separate transaction.  This ignores the victim's testimony that defendant made threats *before and after* the axe attack, and thus *before* any struggle in the creek, although jurors could have chosen to reject that testimony.

Defendant also posits that some jurors may have thought he exercised self-defense in striking the victim with an axe.  This argument seems to have less to do with breaking the transactional connection between the axe strike and the criminal threats and instead suggests that the axe strike should not support true findings because it was self-defense.  Or perhaps his argument is that any jurors inclined to conclude defendant acted in self-defense when he cleaved the victim's chest with an axe would also conclude this alone established that this act was of such a different character as the subsequent criminal threats so as to render the two entirely different transactions.  We note here that we decline to join defendant in speculating why the jurors deadlocked on counts 1 and 3.  (See *People v. Foy* (2016) 245 Cal.App.4th 328, 352 [it is not the appellate court's role to speculate on the reason for a deadlock, although divergent verdicts suggest a close case].)

In any event, defendant parses the circumstances of this ongoing altercation too finely in his attempt to divide it into discrete transactions.  We are not persuaded that the testimony describes anything but a single, continuous, and rather brief transaction.  Even assuming the existence of the choking incident defendant described and the victim denied, according to B.D., this occurred at the creek within 30 to 45 seconds of the men first approaching them.  According to the victim, after defendant struck him in the chest with an axe, he and defendant tumbled down to the creek, or defendant pulled him down to the creek, a continuation of the ongoing melee.  Defendant himself testified that the

13

victim choked him "in the chaos." Even putting aside the threats defendant made before the axe attack, we could not conclude that the threats defendant made during the latter stages of the fight were "separate from the initial 'axe' incident" as characterized by defendant, and thus a separate transaction from the axe strike.

In his reply brief, defendant raises a slightly different argument than those in his opening brief. He argues that the act giving rise to the enhancements, the axe attack, occurred *before the underlying criminal threats crime even began* (assuming the threats the victim described before the axe attack are ignored), and, as such, cannot be deemed to have occurred *during the commission of* criminal threats. However, in *People v. Masbruch* (1996) 13 Cal.4th 1001, the Supreme Court concluded that the use of a firearm that occurred approximately an hour before the defendant committed sex offenses occurred "in the commission of" those sex offenses. (*Id*. at pp. 1003, 1011.) Among other things, the Supreme Court concluded that "a jury could reasonably conclude that although defendant's presence with the victims was sporadic, the control and fear created by his initial firearm display continued throughout the encounter," including during the subsequent sex offenses. (*Id*. at p. 1011.) The court further stated that "the jury could reasonably conclude that defendant, by his initial display, 'utilized the gun at least as an aid in completing an essential element of' the crimes of rape and sodomy . . . ." (*Ibid*.) "In addition, a jury could also conclude that the fear defendant's initial gun display instilled continued throughout the encounter and aided defendant in completing an essential element of the crimes of rape and sodomy." (*Ibid*.) Here, even if we ignore the earlier criminal threats, the fact that defendant had driven an axe into the victim's chest moments before making his subsequent threats "aided defendant in completing an essential element of the crime[]" of criminal threats. (*Ibid*.) Specifically that act aided defendant in completing the elements "that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' " and "that the threatened person's fear was 'reasonabl[e]' under the

14

circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 228; see CALCRIM No. 1300.)

The evidence established defendant leveled the same criminal threats at the victim both before and after the axe attack. The axe attack occurred "during the commission" of criminal threats (CALCRIM Nos. 3145, 3160) within the meaning of relevant case law (*People v. Jones, supra*, 25 Cal.4th at p. 110; *Elder, supra*, 227 Cal.App.4th at p. 422). The axe attack was part of the same "continuous transaction" (*Frausto*, *supra*, 180 Cal.App.4th at p. 902) as the criminal threats, whether those threats were made before and after the axe attack or only after.

Under these circumstances, we conclude that defendant has not satisfied his burden of showing that it is reasonably probable that he would have achieved a more favorable result had counsel objected and requested the response now proposed by defendant on appeal.

DISPOSITION

The judgment is affirmed.


_____\s\_____,
Krause, J.



We concur:



\_\_\_\_\_\s\_____,
Mauro, Acting P. J.



\_\_\_\_\_\s\_____,
Boulware Eurie, J.

15